<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊<␊

**SIGNED this 10 day of May, 2022.**



_____
**John T. Laney, III
United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| In re: ) | |
| ) | |
| ERIC AND JERRIE LEE ) | Chapter 7 Proceeding |
| ) | |
| Debtors, ) | Case Number: 21-40087- JTL |
| _____) | _____ |
| ) | |
| COMMERCIAL CAPITAL BANK ) | |
| ) | |
| Movant, ) | |
| ) | |
| v. ) | |
| ) | |
| ERIC AND JERRIE LEE ) | |
| ) | |
| Respondents. ) | |

**MEMORANDUM OPINION ON CREDITOR COMMERICAL
CAPITAL BANK'S MOTION TO DISMISS**

The above-styled case came before the Court on a motion to dismiss filed by Commercial Capital Bank, the Creditor. The Creditor claims the Debtors, Eric and Jerrie Lee, have abused the bankruptcy system and their case should be dismissed under 11 U.S.C. §§ 707(a), 707(b)(2), and 707(b)(3). For the reasons stated below, the Court finds the totality of the circumstances show that Debtors have abused the bankruptcy system and their case should be dismissed under § 707(b)(3).

I.         POSTURAL PROCEEDING AND FACTS PLED

Mr. Lee is an anesthesiologist and reports an annual gross income of $346,152; Mrs. Lee stays home with their children, four of whom live with the family full time and two who live with the family during the summers. Hr'g Held, Doc. 103. The Debtors have other adult children who do not live with the family, but they receive some financial support from the Debtors. *Id*. The Debtors moved to Columbus, Georgia and rented a home before moving into the home they later bought from F. Steve Taylor. *Id*. Mr. Taylor first sold the Debtors the lot adjoining the home they later bought for $130,000 which the Debtors planned to pay over thirty years. *Id*. The Debtors had planned to build a home on the property but determined the price to build the home would be too expensive and approached Mr. Taylor about buying the home he owned next to the lot. *Id*. Mr. Taylor first rented the home to the Debtors for $2,500 per month before selling the house to them. *Id*. The Debtors purchased the home from Mr. Taylor on February 22, 2021, for $1.035 million. *Id*. Ex.11. Mr. Taylor also financed the Debtors' purchase of the home, allowing the Debtors to make a down payment of $20,000 and pay the balance over thirty years at $6,002.58 per month. *Id*.

The Debtors filed for Chapter 11 bankruptcy on March 5, 2022. Chapter 11 Voluntary Pet., Doc. 1. The Debtors reported unsecured claims on Schedule E/F totaling $961,134.78

including $569.145.08 in student loans. Amend. Schedules E/F, J, Doc 51. The Debtors reported secured claims Schedule D totaling $1,242,707.00, most of which were the two real estate mortgages to Mr. Taylor. Schedules A-J, Doc. 17 at 12.

On June 4, 2021, the Lees converted their case to Chapter 7. Mot. To Convert Case to Chapter 7, Doc. 29. The Debtors filed amended schedules which updated their expenses on August 8, 2021, demonstrating a net monthly deficiency between their income and expenses of $7,145.54. Amend. Schedules E/F, J, Doc. 51 at 19-20. The Debtors also filed Official Form 122A-2, the "Chapter 7 Means Test Calculation" in which they reported their disposable income over five years as negative $51,200.80, therefore there was no presumption of abuse. *Id.* at 31.

The Creditor filed a proof of claim for an unsecured claim against the Debtors of $175,579. Proof of Claim No. 5. The Creditor's debt represents a note for the balance due after the Debtors sold their home in Monroe, Louisiana for less than the amount due to the Creditor. Hr'g Held, Doc. 103. Mr. Lee testified that he considered consenting to foreclosure on the home in Louisiana, but a representative of the Creditor promised to "rollover" the debt into a new business loan or investment into a business venture. *Id.* The debt was not converted to a new business loan and no payments have been made towards the loan since its incurrence. *Id.* Mr. Lee also testified, after moving to Florida from Louisiana, the Debtors filed for bankruptcy in the Middle District of Florida, but voluntarily dismissed the case. *Id.*

The Creditor filed a motion to dismiss this case pursuant to §§ 707(a), 707(b)(2), and 707(b)(3) on October 11, 2021. *Id.* The Debtors appeared to oppose the motion during a hearing on April 22, 2022. Hr'g Held, Doc. 103. During the hearing, the Debtors moved to deny the Creditors motion under Federal Rule of Bankruptcy Procedure 7052(c), which the Court denied

3

and continued the hearing. *Id*. At the conclusion of the hearing, the Court took the Creditor's motion to dismiss under advisement. *Id*.

## II.   DISCUSSION

The Creditor moved to dismiss under §§ 707(a), 707(b)(2), and 707(b)(3) of the Bankruptcy Code claiming the Debtors abused the bankruptcy process. Mot. to Dismiss, Doc. 67. This Court denies the motion as to § 707(b)(2) but grants the motion as to § 707(b)(3). Because the Court grants the motion under § 707(b)(3), it is not necessary to rule on the motion under § 707(a).

### a.   The arguments made to dismiss the Debtors' case under 707(b)(2) are unpersuasive to the Court.

The Court begins its analysis with § 707(b)(2). Congress enacted § 707(b)(2) along with a "means test" to give courts an objective measure of whether an individual debtor is abusing the bankruptcy system. The "means test" allows a debtor to compare his or her actual monthly expenses for necessities including their mortgage, medical expenses, and household expenses to the debtor's monthly income. *Official Form 122-A*. If, over five years, the aggregate difference between the debtor's income and expenses is less than $9,075, there is no presumption of abuse. *Id*.

The Debtors report a monthly income of $18,492.00 and $25,638.54 in monthly expenses leaving a reported monthly deficit of $7,146.54. Amend. Schedules E/F, J, Doc 51. Much of the hearing on this matter focused the Debtors' change in circumstances since filing their amended schedules and whether their expenses should be reevaluated for purposes of the means test. Hr'g Held, Doc. 103. The Debtors and Creditor disagree as to whether the Court should use the Debtors' expenses at the time of filing their amended schedules or their current expenses to

4

determine whether they fall under the presumption of abuse. *Id*. At the time of filing, the Debtors were paying just less than $9,000 for their mortgage, utilities, other housing expenses and roughly $2,000 in additional expenses for the lot adjoining their home. Amend. Schedules E/F, J, Doc 51. At the hearing, the Debtors testified they no longer owned their home and the adjoining lot and had moved into an apartment with around $2,500 in housing expenses. Hr'g Held, Doc. 103. The Debtors also welcomed twins by surrogacy in December 2021. *Id.* The Debtors contracted the surrogacy services pre-petition and included on their schedules a $3,000 per month expense between March and January 2022. Amend. Schedules E/F, J, Doc 51. At the time of the hearing, the pregnancy was complete, and the surrogacy services were no longer an ongoing expense. Hr'g Held, Doc. 103.

Courts follow two lenses through which to look at expenses – the "snapshot" approach and a forward-looking approach. The Creditor argues the Court should use the forward-looking approach and should look at the change in the Debtors' expenses, namely the roughly $6,500 month reduction in the costs of their housing, the $2,000 per month reduction in costs from the the adjoining land, and the completion of surrogacy services and its $3,000 per month in associated costs, to determine the Debtors' eligibility under the means test. The Debtors argue that the means test is meant to capture a "snapshot" of the Debtors' finances at the time of filing their schedules, not an ongoing evaluation to capture the Debtors' change circumstances.

The opinions cited by the Creditor supporting the forward-looking approach are distinguishable from the Debtors' case. The Creditor cited *In re Powers*, 534 B.R. 207 (Bankr. N.D. Fla. 2015) and *In re Thompson*, 457 B.R. 872 (Bankr. M.D. Fla. 2011) in support of its position. In both of those cases, the debtors had surrendered or stopped payments on the property *before* filing bankruptcy and still included the payments in their means test calculation.

5

In *Powers*, the debtor included payments on her calculation for the means test on a mortgage that she had not made since before July 2013 whereas she filed bankruptcy in July 2014. 534 B.R. at 208. The debtor and her family had moved out of the property pre-petition and planned to surrender the property during bankruptcy. *Id*. Including the mortgage payments the debtor had ceased making, her net income fell into the negative. *Id*. When the mortgage payments were excluded, the debtor had a net income over sixty months which would allow her to pay about forty percent of her unsecured creditors. *Id*. at 215. The court found the debtor had abused the bankruptcy system by including the payments she did not actually have or intend to make to inflate her expenses to pass the means test and dismissed her case.

In *Thompson*, the debtors listed payments for a mortgage for a property for which they ceased making payments in fall of 2010 before declaring bankruptcy in February 2011. 457 B.R. at 877. The debtors testified at the meeting of creditors they had surrendered the property and moved into a rental home *Id*. at 875. The Court disallowed the payments because, since the debtors had not made payments for months pre-petition and had moved from the property, the mortgage were payments "not actually-incurred expenses." *Id.* at 880. The Court found the debtors' mortgage payments inflated their expenses for purposes of the means test and found there was a presumption of abuse in their case.

In this case, while the Debtors' timing of their home purchase is suspicious and will be later discussed in detail, the Debtors did live in the house at the time of filing the petition and made payments from April 2021 to February 2022. Hr'g Held, Doc 103. The Creditor's reliance on *Powers* and *Thompson* ignores that payments were made to the mortgagee during the pendency of the Debtors' bankruptcy case, distinguishable from the "phantom payments" in its cited cases. *In re Powers*, 534 B.R. at 215. The same applies to the surrogacy payments that the

6

Debtor made from March 2021 to December 2021. Therefore, the *Powers* and *Thompson* decisions are inapplicable to the Debtors' situation and are unpersuasive to the Court.

This Court has previously found the "snapshot" interpretation the appropriate approach under § 707(b)(2). *In re Altman,* 2009 Bankr. LEXIS 4185. The plain language of the statute continues to support that reading. By relying on cases distinguishable from the case at bar, the Creditor failed to provide the Court with law that would persuade the Court to reexamine its ruling. Therefore, in accordance with the Debtors' reported income and expenses as of their amended schedules, the Court does not find a presumption of abuse under § 707(b)(2).

**b. The Debtors' case should be dismissed under 707(b)(3).**

The Creditor also filed its motion to dismiss under § 707(b)(3). Under § 707(b)(3), the Court moves beyond the means test and addresses whether the debtors engaged in bad faith or whether their case should be dismissed under the "totality of the circumstances." The Debtors' failure to comport their lifestyle to their financial situation, their suspicious house purchase while considering bankruptcy, and their lack of consideration for creditors lead the Court to find the Debtors' case should be dismissed.

The Debtors report a monthly income of $18,492.00 and $25,638.54 in monthly expenses leaving a reported monthly deficit of $7,146.54. Amend. Schedules E/F, J, Doc 51. As discussed above, the Debtors' expenses included $3,000 per month for surrogacy services and close to $9,000 in housing expenses and utilities. Hr'g Held, Doc. 103. The Debtors also owned and paid about $2,000 per month for a mortgage and real estate taxes on the lot which adjoined their property. *Id*. The Court granted the mortgagee of the Debtors' two properties relief from the stay in early 2022. Order Granting Mot. for Relief from the Stay, Doc. 92; Consent Order Granting Mot. for Relief from the Stay, Doc. 99. The Debtors testified they moved into an apartment and

7

now pay slightly less than $2,500 currently for housing expenses. Hr'g Held, Doc 103. However, after reducing their monthly expenses by roughly $11,500, the Debtors' testified they could still barely make ends meet. *Id*.

      The Debtors repeatedly testified about the modesty and necessity of their expenses; however, they have either continued or begun paying expenses that are unessential or objectively unreasonable for debtors in bankruptcy. After being questioned about the changes in their current expenses from what they reported in their amended schedules, the Debtors testified they continue to support their adult children, including paying for their son's tuition and supplies for farrier school, and are paying for Mr. Lee to attend Auburn University seeking a master's degree in business administration. Hr'g Held, Doc. 103. While, during their testimony, the Debtors prided themselves on investing in themselves and their family, the bankruptcy system is not meant to allow debtors to forsake the interests of past creditors for the benefit of investing in themselves or contracting with new creditors. The Debtors also testified that each month they spend $800 clothing their family, pay $250 for personal care, and spend $3,000 on food. *Id*. The IRS estimates for the cost of those categories for family of six plus household supplies and miscellaneous expenses, should total $1,978, over $1,000 less than what the Debtors claim to spend on food alone.[1] *IRS National Standards for Allowable Living Expenses*, https://www.justice.gov/ust/eo/bapcpa/20210401/bci_data/national_expense_standards.htm. The Court does not question the Debtors' truthfulness in reporting these figures but cannot allow

---

[1] The Debtors testified that two additional children live with them during the summer. Hr'g Held, Doc. 103. The IRS estimates the monthly expenses for a family of eight should be $2,410 for food, clothing, housekeeping supplies, personal services, and miscellaneous expenses. *IRS National Standards for Allowable Living Expenses*,
https://www.justice.gov/ust/eo/bapcpa/20210401/bci_data/national_expense_standards.htm. That is still less than the Debtors claim to spend on only food monthly.

8

above-median income debtors to evade payment to creditors while indulging themselves in excessive expenditures.

Furthermore, the Debtors knew of their financial difficulties as early as September 2020 and testified they visited a bankruptcy attorney in Georgia, but still proceeded to purchase a home for over one million dollars. Hr'g Held, Doc. 103. The Debtors also testified they moved up the closing date from April 2021 to February 2021 without explanation and filed for bankruptcy in March 2021, two weeks after the closing. *Id*. While the Debtors claimed they intended to stay in the house and make payments toward the house, their decision to purchase the house and include their mortgage payments on the bankruptcy schedules did inflate their expenses to a negative net income that nearly equaled their mortgage payments, assuming they would pass the means test. Before closing on the house, the Debtors paid $2,500 in rent on the property. *Id*. Had the Debtors included their monthly rental price on the property instead of the mortgage payment, the Debtors would have reported surplus income to pay their creditors. Therefore, the decisions by the Debtors both to purchase a luxury home two weeks before filing for bankruptcy and to move up the closing date to ensure their mortgage would be included on the means test calculation lead to the Court to find that the Debtors have abused the bankruptcy system.

The Debtors argued that they could not fund a Chapter 11 or 13 plan, an important factor that Courts look to when dismissing a case under § 707(b)(3). *See Fonder v. United States*, 974 F.2d 996, 999 (8th Cir. 1992); *In re Scheinberg*, 134 B.R. 426, 430 (D. Kan. 1992). The Debtors would not qualify for Chapter 13 as they have debts exceeding the limits in that chapter, so the Court looks at whether they could fund a Chapter 11 plan. The evidence presented to the Court, however, is unclear whether the Debtors could in fact fund a plan. As discussed, the unnecessary

expenses reported by the Debtors, if ceased or reduced, could help fund a Chapter 11 plan. The Debtors claimed payments to the IRS would extinguish any payment to unsecured creditors. H'rg Held, Doc. 103. The estimated payments to the IRS are roughly $2,500; the Debtors testify they have enough income to pay, on average $1,855 per month in tuition to Auburn, plus an estimated $820 per month to support the Debtors' adult children. *Id*. If the Debtors reduced those and other discretionary expenses by a modest amount, they would have enough to make the payments for the IRS and likely a dividend to unsecured creditors. There are, however, additional questions about the pending payments on Mr. Lee's student loans and his future employment. *Id*. Nonetheless, while the ability to fund a Chapter 11 plan is an important factor, it is not the only factor the Court looks at when examining the totality of the circumstances of a Debtors' condition. Therefore, although it is likely, but not certain, the Debtors in this case could successfully fund a Chapter 11, the Court looks to the bigger picture of the Debtors' choices in determining that they abused the bankruptcy system.

      The Court finally looks at the debt owed to the Creditor. The Creditor's debt is an unsecured judgment resulting from the sale of the Debtors' residence in Louisiana for less than what was owed to the Creditor on the mortgage. Hr'g Held, Doc. 103. The Debtors signed a promissory note agreeing to pay the deficiency. *Id*. Mr. Lee testified that the Debtors should have allowed the Creditor to foreclose on the house and "that would have been that." *Id*. Under Louisiana law, a creditor can obtain a deficiency judgement against a debtor after a foreclosure sale if the foreclosure sale complies with Louisiana law. La. Code Civ. Proc. Ann. art. 2771. The Debtor also stated an officer of the Creditor promised to convert the debt into a business loan, but no other evidence was presented to corroborate this claim and the loan was never converted. *Id*. No payment was made on the note to the bank and the Debtor testified he filed for bankruptcy

in Florida after incurring this debt. *Id*. Instead of formulating a plan to pay off the debt after voluntarily dismissing the case in Florida, the Debtors approached a bankruptcy attorney in Georgia upon receipt of an attorney letter from the Creditor attempting to collect on the debt. *Id*. Between their initial desire to allow the Creditor to foreclose on the home to avoid a deficiency judgment, attempts to convert the note into a "business loan," and repeated bankruptcy filings following the Creditor's collection efforts, it appears the Debtors have made a concerted effort not to make payment on the note. Because it seems the Debtors have attempted to use the bankruptcy system as a method to avoid paying the Creditor's debt, their case should be dismissed.

### III.    CONCLUSION

For the reasons set forth above, the Court grants the Creditor's motion under 11 U.S.C. § 707(b)(3) and the Debtors' bankruptcy case is dismissed. An order will be entered accordingly.

END OF DOCUMENT